The United States Court of Appeals for the Federal Circuit is now open for discussion. I thank the United States for this honorable court. Good morning. Good morning. First case this morning is 09-3109, Fitzgerald v. the Office of Personal Management, Mr. Hendricks. Yes. Good morning. May it please the court, I'm Merle Hendricks and I'm representing Mr. Tom Fitzgerald. What we have today is a performance case, not an ordinary performance case, but a performance case with a misconduct case penalty. What is the offense? The offense is a first offense of inaccurate report writing. Inaccurate report writing supported by some 57 specifications. Specifications have to do with information that was gathered by my client, Mr. Fitzgerald, written into his reports, and when they went back and did re-interviews of witnesses 18 months later, they came up with different information. Any trial lawyer will tell you if you interview a witness 18 months later, you're likely to get new and different information. Yet, OPM insists that this information was correct, that they gathered in their second view, and any error must have been my client's fault. The presiding official, or the administrative judge, so held that it was his fault. Yet, the penalty was calculated not based on this inaccurate report writing, it was calculated based on willful misconduct. Mr. Hendricks, it seems to me the administrative judge did recognize the fact that sometimes when you interview witnesses at a later time, you might have slightly differing views of what transpired. It seemed to me that was taken into consideration. Was it not? Your Honor, I don't believe it was, because none of the 57 instances were different information, different information as to the length of association. In a number of cases, somebody knew somebody less well or more than Mr. Fitzgerald indicated in his report. So that kind of information, in terms of the quality and the repetitiveness of the association, could very well have been different information. No charges were not sustained. And it was up to the agency to prove that their information was correct by a preponderance of the evidence. Basically, the administrative judge just gave all of the decision, gave it all over to the other side. But this court does not need to reach that issue. I mean, this is a very tenuous performance case. And I want to point that out, and it's a tenuous performance case. We have in our brief cited the Hawthorne effect, which is a recognized psychological principle. If somebody gets interviewed the second time, and they know it's the second time, they're on a different psychological tenor, and they're likely to give different information. They think maybe there was some error in their answers. These people are giving information about people that they don't know that well. People who are their neighbors, people who are their colleagues, people who they're not, it's not information about them. The other thing you want to know in this case is, there was testimony from the deciding official that none of the information that was reported inaccurately resulted in any difference in any granting or not granting of any security clearance. There's no issue of national security here. This is not a case where somebody got through that shouldn't have gotten through, or somebody didn't get through that should have gotten through. There was no significant impact on OPM. OPM, in their brief, says, well, we just couldn't trust him because of the amount of the errors. Well, Mr. Fitzgerald's errors, the ones that he was charged with, are less than 1% of his work for that 18-month period. The regional average at the time was 6% of the reports were deficient and had to be sent back. Mr. Fitzgerald had only two reports sent back in the six-month period that immediately preceded this that ended in April 2006. Yet, somehow, in this investigation, Mr. Fitzgerald got swept up with the people who were writing false reports. He got swept up in this investigation. This is not an ordinary performance case. This comes out of a law enforcement type investigation. Agent Krupp was looking for instances of ghost reporting. Ghost reporting is simply not interviewing people and then writing things as if you had interviewed them. There is no evidence here. They didn't charge that. They can't prove that. But somehow, he got swept up and got tarred and feathered with those people. I think there were also people who were removed for ghost reporting, maybe through this investigation, I'm not privy to that information. It's not in the record. But this is not that case. This is a case about a 20-year-old employee who had an exemplary performance rating who, in his last rating, had been rated above average. He was certainly not on any sort of notice that he was in any peril of losing his job until he was brought into a room in August 2006, sat down, asked a series of law enforcement type questions. When he refused to provide a statement without getting counsel and without having, he was summarily put on administrative leave and he was never allowed to return. With respect to the 57 specifications that the board addressed, I didn't see anything in your brief where you're contesting that the conduct that was reported did or did not occur. It seemed to me that there was, that you're making arguments about whether he should have been permitted to improve his performance and all of the things related to performance type standards. But I didn't see anything in your brief where you're contesting that any of the 57 specifications actually did not occur. Well, in the reply brief, we do actually talk about the Hawthorne effect and the fact that it is likely that there are differences when you do the first interview. I understand that. But that goes... But you're not contesting that those 57 incidents did occur, correct? We're not contesting that he did interview those people and that he may have gotten... And that the reports were inaccurate. Some of those information, the information is different than what they got the second time. We cannot contest that because it is different. So that the reports were inaccurate as set forth in the specifications. Well, Your Honor, I think there's a distinction between inaccurate and different. That answers my question. My question is whether you're contesting whether the inaccurate reports set forth in the 57 specifications were incorrect. Yes, Your Honor, we are. They were not correct. And I think this court... I didn't see that in your brief. I believe, Your Honor, in the brief, we're arguing it as part of the mitigation that these charges are not based on an accurate and reasonable measure of measuring his performance. But those are fact questions, aren't they? We're not in a position to decide whether they're accurate or not. I believe you can accept the providing... What you're doing is trying to put coloration around this and saying other people did the same thing and they brought him into a room and they gave him an inquisition-type questioning. But the fact is, or at least the facts as we're presented with them and bound to respect them, is that 57 out of 61 instances that they examined were shown to be incorrect. And on that basis, they've disciplined him. Your Honor, I agree with you that there were 57 findings that were supported by the Merit Protection Board, and you have to accept that as a factual matter. What I wanted to point out is that those 57 represent, out of 1,500, that the error rate is 1%. That this is a case where he was never given... He was never put on notice that these errors were there and that they needed to be changed. These reports had been reviewed by his previous supervisors. He'd gotten feedback and they were okay. We don't know that all 1,500 were examined. No, that was the policy, was that they were supposed to look at these reports and review them. What they did here is they stepped clear out of the performance cycle and went back and did re-interviews. Why we have this case, this case is based on re-interviews. The re-interview methodology, we think, is questionable, but you can accept that finding and still find that this case is not appropriate because the penalty of removal is too harsh. The penalty of removal is beyond what should be for a performance-based case for a 20-year employee who had been adaptable, who had worked well. There's testimony in the record that he had worked well with his supervisors. His last rating was above average. His supervisor, the last one, wrote that, quote, a review of your cases indicates you still have problems with formatting. However, the content is usually adequate. On two occasions, I rated ROI's, reports of investigations, deficient. The first case lacked sufficient information concerning financial issues. The second lacked sufficient medical information from the subject. These instances of lack of coverage are not indicative of your work as a whole. That was the last performance feedback he got from his supervisor, Ms. Burke. Well, you're trying to argue that this should have been a chapter 43. I am not trying to argue that, Your Honor. It is a chapter 75. It's legitimately broad as a chapter 75, but the precedent of this court and the board require that the lack of a performance period be taken into account and that other factors be taken into account. Here, you have a case where they've used the last penalty, the most severe penalty, without any notice, without an opportunity to improve, and for an employee who has 20 years of no documented performance history. I just think as a management thing, forget the law for a minute, stepping back from the law. As a matter of management, it's a very curious place to be. We can't step back from the law. Nor should you. But here, the law says that their penalty is supposed to be based on the charge they actually brought. They didn't bring an intention charge. They didn't bring a misconduct charge. And the judge was very clear. The first day of the hearing, I tried to raise this issue, and the judge said, no, we're not talking about misconduct. We're only talking about performance. Then they proceeded to fashion a penalty that was based on misconduct, on intentionality, on I've lost confidence in you. There is no evidence in the record. They did not charge, and they could not have proven that Mr. Fitzgerald did anything intentionally. It is not that case. Why don't we hear from the government now, and you can come back and rebuttal. Mr. Breskin. Good afternoon. May it please the court. I'm going to just jump right in and start off where he left off. This is not a case where the agency based its penalty of removal on intent. The decision letter does not speak to intent, and in the penalty assessment, it is not based on Mr. Fitzgerald's state of mind. In petitioner's brief, he block quotes the notice of proposed removal where there was a discussion of intent in the penalty assessment, but when the deciding official actually looked at the facts, he did not base it on intent. The part of petitioner's brief where he sets up this falsification argument is irrelevant here, because there was no falsification charge. The charge was simply inaccurate reporting, and it was supported by 57 specifications found by the judge. The evidence the court was right to point out supports the 57 specifications, and petitioner is not in fact contesting that those inaccuracies were in his reports. What this case really boils down to is an argument that the penalty was unreasonable because petitioner claims the mitigating factors outweigh the aggravating factors. But if you look at the decision letter at page 37 of respondent's appendix, it's clear that the deciding official considered the mitigating factors in the first paragraph and then set forth the aggravating factors and found that the aggravating factors outweighed the mitigating factors, and he went through and set forth in detail what effect Mr. Fitzgerald inaccurate reporting had on OPM, on OPM's mission, and on OPM's now lack of confidence in Mr. Fitzgerald to conduct these investigations honestly and with integrity, and that they could no longer trust him to do so, and found that removal was the only penalty appropriate. And that gets directly, of course, to nexus, which is that the misconduct here was that he inaccurately reported, and that goes directly to his job performance, which is that he's required to accurately convey the results of his investigations in his reports of investigation. One other point that petitioner made while he was up here was that the agency was required to consider the lack of an improvement plan, and I believe the site for that would be Farrell, which is a board decision, which was affirmed by this court. In Farrell, the board did not say, what the board said was that a lack of an opportunity to improve is not a per se mitigating factor. Moreover, in the facts of this case, Mr. Fitzgerald did have an opportunity to improve. In the record, his supervisor at the time, Janine Burkhead, in January 2006, which is six months before he was interviewed by the integrity assurance team, actually gave him a case review in which it said, you're cutting and pasting is resulting in inaccurate reports, and you need to stop doing that. You're not permitted to do that. So he, in fact, had an opportunity to improve his performance. He knew that he was putting inaccuracies into his reports, and he failed to take account for that. Now, one of petitioner's other arguments is that the percentage error rate here is small in comparison, but there's no authority for the fact that OPM needs to use a comparable error rate. In addition, if you look at the facts that's set forth in the integrity assurance team report, what they did was when they discovered there were identical testimonies and inaccuracies, they went back and simply looked at a 90-day period, and they found inaccuracies resulting from his performance in almost all of those reports. So there was a systematic and objective look, and there's no need for them to do a comparison to the error rate or the inaccuracies in other reports. So unless the court has any other questions, we respectfully ask the court to affirm the decision of the board here. Is there anything to suggest that the inaccuracies in any of these 57 reports were deliberate? They didn't uncover any evidence. The only evidence that sort of speaks to that is that when he was interviewed by Philip Krupp, who was the investigator who interviewed his case, he admitted to knowing that he had put inaccuracies in his reports, that he provided information to sources, asked them to verify it, and then put it in the reports as if they had known the information. So he knew that the information was generally correct, but not specific to that source. So there's no evidence that he deliberately sought to mislead the agency. Is there anything, then, to suggest that Mr. Fitzgerald's work was anything other than perhaps just poor reporting? He was filling out reports that he thought were accurate and later turned out to be inaccurate. Is it, under those circumstances, proper to terminate somebody? Well, the agency is within its rights to terminate someone simply for poor performance under Chapter 75. This is a court held in Luption. Poor performance, if you look at the factors and you do the penalty analysis, is more than enough to justify removal. I guess what I'm getting at here is whether there was anything here other than poor performance. And I'm not suggesting that poor performance under these circumstances may not be a proper basis to remove him. But I'm just asking about the record here, and it ties in with the arguments made by Mr. Fitzgerald's counsel about these charges really having some element of intent. Well, the charge itself doesn't have any element of intent. But if you look at, if you go into the actual specifications, I think it's not just poor performance. He didn't do a good job. In Specification 5 and 6, he put in his report that he received and reviewed a security clearance form for someone who was either applying for federal employment or getting a background check. The person who he put in his report had provided him with that report actually testified at the MSPB hearing and said, not only were those reports, those security files, not held at his office, but he never gave it to Mr. Fitzgerald. He never requested it for Mr. Fitzgerald. So Mr. Fitzgerald put into his report that he had received and reviewed a report that he never received nor reviewed. In addition, he received information from sources that he simply failed to put into his reports. Specification 27 was an interview that he conducted with an actual subject. The subject told him that he had been arrested for a felony, and he failed to put that into his report. And so whether or not that evinces some deliberate action on his part, the agency wasn't required to prove that to stay in the charge here. But it's more than just a case of simple, I put the wrong year here or I had a typo here. The conduct he engaged in went far beyond a simple, just he didn't do a good job here. Thank you. Thank you. Mr. Hendricks? If it pleases the court, I wanted to just look at page 36 and 37, the decision by Mr. Shine, and read from that. It says, you should serve as a model and leader to your coworkers, requiring your credibility as an investigator to have been severely compromised by your misconduct. Your misconduct is incompatible with the responsibility, authority, and discretion of the investigator. This is clearly a decision based on misconduct. And this is right in the middle of the decision of what the penalty should be. The deciding official, contrary to counsel's representations in his testimony and in this letter, specifically says, I've lost confidence in you because I think you're engaged in misconduct. I believe you've falsified the report. He doesn't use the word falsified, but he says your credibility has been hurt. People make errors. My client would be the first to say that in writing 1,500 source reports, he probably made some errors. We don't believe he made as many errors, but if there are 57 errors, he was willing to work on that. He did not get notice of Ms. Burkhead in January. There was no cite to the record in their briefs, and for counsel to mention it now is to misstate what the record shows. Ms. Burkhead. These aren't errors in writing numbers down, putting a 3 instead of a 13. These were cutting and pasting. That's more than just an error. But cutting and pasting using model paragraphs was acceptable practice. If the information was correctly conveyed. Here, what happened is in his cutting and pasting, in one of the cases, the wrong first name and the wrong last name end up together. So that's clearly a cutting and pasting error. Some of the others, apparently he misread his notes. The agency was not able to provide him with any of the notes that he took, so that we could go back and look at whether his notes were accurate or not, or his notes had been transposed. Those records were not available to us in the hearing. In this case, what you have is a simple case of somebody who has a lot of reports to write, and apparently in putting their reports together, there were some errors made. And we admit that there were some errors made, and we think Mr. Fitzgerald, after 20 years of exemplary performance, with an above average rating at the time that this came down, should have been given a second chance. He could have been given a two-week period, a four-week period, whatever period is appropriate. We think this honorable court should reverse and remand this. Do you think a person with 20-some years of service should be held to a higher standard than someone with lesser experience? I think in some cases, if it were intentional misconduct, absolutely. But here, on a performance basis, where you've had 20 years of being able to do the job, I don't think that you send them into basically oblivion without a chance to show that they can still do the job. This is a performance-based case. There's no evidence of intent. They didn't charge it. Counsel very carefully says, we didn't have to charge it. Well, they didn't have to charge it, they didn't charge it, and they can't rely on it for the penalty. And that's what the law says, and that's what they did. It's right here in Mr. Schein's letter. It was in his testimony, and this court should reverse and remand for the board to set an appropriate penalty, which would be a lesser penalty than approval. Thank you very much. Thank you. Case is submitted.